UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

John Hendricks,                                    Civ. No. 11-1627 (JNE/LIB)

      Plaintiff,

v.                                                 **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE,

      Commissioner of Social Security,

        Defendant.

## I.    INTRODUCTION

John Hendricks ("Plaintiff") seeks judicial review of the decision of the Commissioner of Social Security ("Defendant") denying his applications for disability insurance benefits (DIB) and supplemental security income (SSI).  The matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  This Court has jurisdiction over the claims pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  The parties submitted motions for summary judgment.  For the reasons set forth below, the Court recommends that Plaintiff's motion for summary judgment be granted, and Defendant's motion for summary judgment be denied.

## II.    PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on June 8, 2005, alleging that he became disabled on May 3, 2004.  (Tr. 135-41).[1]  Plaintiff's applications were denied initially on September 5, 2006, and upon reconsideration on July 1, 2008.  (Tr. 57-66, 81-90).  Plaintiff requested a hearing before an administrative law judge ("ALJ"), and the hearing was held before ALJ Leonard A. Nelson on January 20, 2010.  (Tr. 98-101, 20-40).  The ALJ issued an unfavorable decision on July 22, 2010.  (Tr. 9-19).  Plaintiff then filed a request for review with the Appeals Council.  The Appeals Council denied his request on June 2, 2011 (Tr. 1-4), thereby making the ALJ's decision the final decision of the Commissioner for the purpose of judicial review.  See Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005).

## III.    FACTUAL BACKGROUND

### A.    Medical Records

Plaintiff underwent a mental health diagnostic assessment with social worker Brian Morseth at Hennepin County Mental Health Clinic ("HCMHC") on June 9, 2005, at the suggestion of his parents.  (Tr. 424-27).  Plaintiff was unemployed for the last year and living alone as the caretaker in the rental property of a friend but would soon lose his housing.  (Tr. 424).  Plaintiff acknowledged longstanding chemical health, mood and behavioral issues.  (Id.)

Plaintiff had difficulty following through with things since elementary school.  (Id.)  As an adolescent, he abused chemicals and suffered variable moods.  (Id.)  Later, he became an auto mechanic and typically worked at a job for six to eight months, then lost

---

[1]    Throughout this opinion, the Court cites the Administrative Record, Docket No. 6, as "Tr."

interest and impulsively quit.  (Id.)  His periods of unemployment were growing, and Plaintiff admitted sometimes going without food rather than asking his parents for help. (Id.)  Plaintiff said he was skilled at "blowing things off" including ignoring his depression.  (Id.)  He had used methamphetamine to moderate his moods from 1995 to 1999, and then was steadily intoxicated with cannabis.  (Id.)  Over the last year, he used cannabis five out of seven nights a week to induce relaxation and sleep, with diminishing benefits.  (Id.)

Plaintiff reported significant feelings of restlessness, fidgetiness and irritability. (Tr. 425).  His irritability had recently caused him to get involved in confrontations with people on the street.  (Id.)  It took him three to six hours to fall asleep, and then he slept only three or four hours.  (Id.)  He had trouble concentrating unless he was highly interested in a topic.  (Id.)  He lost interest in most activities and was somewhat socially withdrawn.  (Id.)  Plaintiff denied, but his parents endorsed, that on occasion he experienced inflated self-esteem and mild euphoria, significant irritability and hyper-energized states, particularly when he was unable to sleep.  (Id.)  Plaintiff denied any symptoms of psychosis.  (Id.)  During the interview, Plaintiff's speech was of normal rate and rhythm and there were no indicators of unusual thought content.  (Id.)

Morseth diagnosed major depression, single episode, moderate; bipolar disorder, type II;[2] attention-deficit/hyperactivity disorder, combined type;[3] cannabis abuse; and

---

[2] Bipolar II Disorder is characterized by the essential feature of one or more major depressive episodes accompanied by at least one hypomanic episode.  The presence of a manic or mixed episode precludes the diagnosis of Bipolar II Disorder.  The symptoms must cause clinically significant distress or impairment in social, occupational or other important areas of functioning.  *Diagnostic and Statistical Manual of Mental Disorders* 393-93 (American Psychiatric Association 4th ed. text revision 2000) ("DSM-IV-tr").  A major depressive episode is a period of at least two weeks with either

methamphetamine dependence in remission.  (Tr. 426).  He assessed Plaintiff with a GAF score of 58.[4]  (Tr. 427).  Plaintiff agreed to undergo individual therapy with Morseth and to address discontinuing his use of cannabis.  (Id.)  Morseth also recommended a psychiatric evaluation with Dr. Ngozi Wamuo.  (Id.)  Plaintiff was referred for assistance in applying for medical insurance and general assistance.  (Id.)

In therapy on June 23, 2005, Plaintiff showed mild improvement after his applications for public housing and general assistance were granted.  (Tr. 420).  The next month, Plaintiff underwent a psychiatric evaluation with Dr. Ngozi Wamuo at HCMHC.  (Tr. 413-15).  Plaintiff reported struggling with insomnia and anxiety for several years, and lifelong inattentiveness.  (Tr. 413).  He tried walking eight miles at night before trying to sleep, but it did not work.  (Id.)

---

depressed mood or loss of interest or pleasure in nearly all activities.  There must be four additional depressive symptoms.  Id. at 349.  A hypomanic episode is a distinct period with abnormally and persistently elevated, expansive or irritable mood lasting at least four days, and accompanied by at least three additional symptoms, four symptoms, if the mood is irritable.  *DSM-IV-tr* 365.  The list of symptoms includes inflated self-esteem, decreased need for sleep, pressured speech, flight of ideas, distractibility, increased involvement in goal-directed activities or psychomotor agitation. Id.

[3]  Attention-Deficit/Hyperactivity Disorder, Combined Type requires six or more symptoms of inattention and six symptoms of hyperactivity-impulsivity, persisting for at least six months.  *DSM-IV-tr* 87.  The onset of symptoms must occur before age 7.  Id. at 86.

[4]  The Global Assessment of Functioning Scale "GAF" is used to assess a clinician's judgment of an individual's overall level of functioning on a scale of 0-100.  *DSM-IV-tr* 32.  Throughout the Administrative Record, Plaintiff was assessed GAF scores ranging from 45 to 60.  A score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  A score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning.  *DSM-IV-tr* 34.

Plaintiff said a teacher once referred him for ADHD assessment, but it was never done. (Id.) Plaintiff felt he focused better when he was abusing methamphetamine, but had not used it for five or six years. (Id.) He presently used cannabis to help him sleep, but it was not working. (Id.) In the past, he felt depressed and unmotivated, mostly in the context of losing a job and other stressful situations. (Id.) He had been having difficulty getting a job for the last year. (Id.) Plaintiff was a high school graduate, with two years of vocational training. (Tr. 414.) He was divorced and had a five-year-old child. (Id.)

On mental status examination, Plaintiff was alert and oriented with normal psychomotor activity. (Id.) He did not endorse any major depressive symptoms but acknowledged getting distracted and bored easily. (Id.) Plaintiff denied hyperactivity, but said he had trouble completing tasks he started. (Id.) He did not exhibit pressured speech or any major cognitive impairment. (Id.) Dr. Wamuo opined Plaintiff appeared to be exhibiting significant symptoms of attention deficit disorder without hyperactivity. (Id.) She diagnosed attention deficit disorder, type 2;[5] depressive disorder, NOS; cannabis abuse; and to rule out bipolar affective disorder, type 2. (Tr. 414-15). She prescribed Strattera for ADD and trazadone for insomnia. (Tr. 414).

Plaintiff also had a therapy session with Morseth that day. (Tr. 416). They discussed Plaintiff's history of inattentiveness, restlessness and hyperarousal. (Id.) Plaintiff's underlying depression was often masked by activity or efforts at distracting himself. (Id.) He continued to use cannabis for sleep and relaxation. (Id.)

---

[5] The Diagnostic and Statistical Manual of Mental Disorders, third edition revision (1987), changed the official name of Attention Deficit Disorder "ADD" to "ADHD," which now includes varying types.
http://www.medicinenet.com/attention_deficit_hyperactivity_disorder_adhd/page9.htm

In therapy on September 13, 2005, Plaintiff was disappointed about having to decline a job offer because he did not have transportation. (Tr. 402). Plaintiff reluctantly filed applications for social security disability and subsidized housing, hoping he would not need either program if he got a job. (Id.) Plaintiff was sleeping better with trazadone, but he still only slept four hours at night. (Id.) He did not feel Strattera was helping. (Id.) Morseth opined Plaintiff's mood and symptoms were unchanged since their initial contact. (Id.) Plaintiff was lucid and clear but admitted increased irritability, especially with his parents. (Id.) There were no indicators of mania during the interview. (Id.) Plaintiff quit cannabis for two weeks, but restarted to help him relax and sleep. (Id.)

Plaintiff's mother contacted Morseth on October 18, 2005, and expressed concern about Plaintiff missing some appointments, and his generally poor judgment and anger. (Tr. 400). She questioned whether Plaintiff's emotional reactivity could have an organic cause, and Morseth agreed to pass her request for a head CT scan on to Dr. Wamuo. (Id.) Plaintiff next saw Morseth on October 27, 2005. (Tr. 397-98). Plaintiff was seeking employment and was hopeful about a particular job. (Tr. 397.) Plaintiff felt his parents were trying to control him, only offering him support if he waited for social security benefits rather than trying to work. (Id.) His mood was discouraged, but he was not acutely depressed. (Id.) Plaintiff acknowledged being irritable, but only when fighting with his parents. (Id.) He also reported continued periodic cannabis use. (Id.) Morseth diagnosed ADD; methamphetamine dependence, in remission; cannabis abuse; rule out bipolar 2; and major depression, single episode. (Id.)

An MRI of Plaintiff's brain on December 1, 2005 was unremarkable. (Tr. 372). A few days later, Plaintiff attended a routine medication management appointment with Dr. Wamuo. (Tr. 389-90). Plaintiff had not taken his trazadone or Strattera for sixty days, and he had used marijuana on a daily basis. (Tr. 389). Plaintiff said Strattera made him tired and trazadone did not help his insomnia, but marijuana calmed him and helped with his sleep. (Id.) Without marijuana, he was irritable, moody and edgy. (Id.)

Plaintiff had been diagnosed with ADHD, but he told Dr. Wamuo he could focus when he wanted to and when things were interesting to him. (Id.) Dr. Wamuo noted Plaintiff was calm and attentive, showing no symptoms of ADD. (Id.) Plaintiff was living with his girlfriend, and his only concern was that he was unable to find a job. (Id.) He quit his last job as a general manager because he got burned out working 70 to 80 hours a week. (Id.) Plaintiff had an upcoming interview, and his mood was not bad. (Id.) Plaintiff acknowledged being stressed about not having a job and not seeing his daughter for the past three months. (Tr. 390).

Plaintiff denied racing thoughts, paranoia and psychotic symptoms. (Id.) There was no evidence of mania or overt evidence of difficulty with concentration. (Id.) Plaintiff was alert, oriented, pleasant and cooperative. (Id.) His psychomotor activity was normal, and he reported good mood, with congruent affect. (Id.) He appeared organized and goal-directed. (Id.) Plaintiff's diagnosis was "quite unclear" to Dr. Wamuo. (Id.)

Plaintiff changed mental health providers and underwent a diagnostic assessment on June 3, 2006, by Dr. Michael Scott at Carver County Mental Health Program. (Tr. 441-45). Plaintiff scored in the upper end of the mild range of depression

on the Beck Depression Inventory.  (Tr. 442).  He scored within normal limits on the Beck Anxiety Inventory.  (Id.)  Plaintiff's records indicated he had been referred for ADHD evaluation, but he had not been evaluated.  (Id.)  However, his reported school history appeared consistent with someone with an attention disorder.  (Id.)  Plaintiff said he had never read a book and had started many projects but had completed virtually none of them.  (Id.)  He admitted being distractible and impulsive.  (Id.)  Plaintiff had a vocational history of burning out quickly on jobs.  (Tr. 442-43).  However, he recently was unable to obtain a job due to a drug charge in the 1990s.  (Tr. 443).  Plaintiff was drinking a 12-pack of beer per week but agreed to quit based on clinic policy of abstinence for therapy.  (Id.)

Plaintiff was fidgety and depressed, but his speech was within normal limits.  (Tr. 444).  His memory appeared to be normal but somewhat selective.  (Id.)  He was oriented and did not display psychotic symptoms.  (Id.)  Dr. Scott diagnosed major depressive disorder, recurrent and moderate; alcohol abuse; amphetamine dependence apparently in remission; rule out bipolar disorder; history of ADHD; cluster B traits;[6] and a GAF score of 50.  (Id.)

On July 10, 2006, Plaintiff told Dr. Scott he had one beer the previous day.  (Tr. 450).  He had been avoiding friends and procrastinating on house work.  (Tr. 451).  At the next session on August 1, 2006, Plaintiff's affect was labile,[7] he was agitated, and he reported having one beer.  (Tr. 452).  Plaintiff endorsed all eight symptoms of manic

---

[6] Cluster B personality disorders include antisocial, borderline, histrionic and narcissistic personality disorders.  *DSM-IV-tr* 701-14.

[7] Affect is the external expression of emotion; and labile affect is characterized by rapid changes in emotion not necessarily related to external events or stimuli.  *Dorland's Illustrated Medical Dictionary* 36 (31st ed. 2007).

episodes defined in the DSM-IV.  (Id.)  He was looking for work but was consistently rejected due to his past drug charge.  (Id.)  His plan was to go to Texas to learn makeup tattooing.  (Id.)

Plaintiff next underwent a psychiatric diagnostic assessment with Dr. Patricia Blumenreich at Carver County Mental Health Program on August 3, 2006.  (Tr. 433-37). Plaintiff said he felt irritable for no reason, lasting up to a week at a time.  (Tr. 433).  He was unable to hold a job for long because "out of nowhere I don't like it anymore."  (Id.)

Plaintiff felt he started to go downhill as early as fourth grade, with inability to sit still, poor concentration and attention, and clowning around.  (Id.)  He never did homework and never completed projects but got B and C grades.  (Id.)  He was always impatient, impulsive, and interrupted others.  (Tr. 434).  He abused drugs in his teen years.  (Id.)  His mood in the last year was low, and his sleep was restless and erratic. (Id.)  He felt drugged and had no motivation.  (Id.)  He cried and was also very irritable and angry.  (Id.)  He had some hope for the future; he wanted to study for a new vocation.  (Id.)

Plaintiff described a two-week episode that occurred eighteen months earlier, where he felt he had to keep moving all the time.  (Id.)  At 2:00 a.m., he walked sixteen miles and could not stop himself.  (Id.)  He was awake for two days without feeling tired and did not notice the cold or need to eat.  (Id.)  He had racing thoughts and others noticed his rapid speech.  (Id.)  Plaintiff did not recall how the episode ended, but he had not experienced anything like it since then.  (Id.)  He started taking trazadone and Strattera after the episode but discontinued due to side effects after five or six months. (Id.)

Plaintiff was mildly fidgety, but his speech was normal and he paid attention to questions in the interview. (Tr. 436). He was oriented but depressed, and his memory and thoughts appeared to be intact. (Id.) Dr. Blumenreich diagnosed bipolar I disorder,[8] last episode depressed; amphetamine dependence, in remission; alcohol and other substance abuse; ADHD combined; and a GAF score of 50. (Id.) She prescribed treatment with lithium. (Tr. 437).

In therapy with Dr. Scott on August 17, 2006, Plaintiff was agitated with labile affect. (Tr. 454). He displayed rapid but non-pressured speech, flight of ideas, psychomotor agitation, and his mood was euthymic but irritable and angry about not being considered for jobs. (Tr. 455). Plaintiff had not yet noticed any changes after being on lithium for two weeks. (Id.)

Dr. Dan Larson completed a mental residual functional capacity assessment regarding Plaintiff at the request of the SSA on September 5, 2006. (Tr. 457-60). Dr. Larson reviewed Plaintiff's medical records and opined Plaintiff could concentrate on, understand, remember and carry out routine, repetitive 3-4 step, limited detailed tasks, with brief and superficial contact with co-workers and the public. (Tr. 459). He could handle a reasonably supportive supervisory style found in many customary work settings and tolerate the routine stress of the unskilled work described. (Id.) Dr. Larson also completed a Psychiatric Review Technique Form and found Plaintiff to meet the "A criteria" of Listings 12.02 organic mental disorders, 12.04 affective disorders, and 12.09

---

[8] The essential feature of Bipolar I Disorder is the occurrence of one or more manic episodes or mixed episodes. *DSM-IV-tr* 382. A manic episode is a distinct period of persistently elevated, expansive or irritable mood. Id. at 362. A mixed episode is a period of time where the criteria for both manic episode and major depressive episode are met nearly every day. Id. at 362-63. Major depressive episode is defined supra n. 2.

substance addiction disorders.  (Tr. 467, 468, 470, 475).  Under the "B criteria" of the listings, Dr. Larson found Plaintiff to suffer mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace, with no episodes of decompensation. (Tr. 477).  Dr. Larson's opinion was affirmed by Dr. R. Owen Nelsen on June 27, 2008. (Tr. 492).

When Plaintiff saw Dr. Blumenreich on September 8, 2006, he showed no signs of mania or depression.  (Tr. 558-59).  Plaintiff was procrastinating less and getting things done.  (Tr. 559.)  He unsuccessfully looked for a job and was considering going back to school.  (Id.)  Two months later, Plaintiff told Dr. Scott he stopped looking for jobs because he had been rejected so many times due to his criminal record.  (Tr. 552-53).  Plaintiff was isolated and depressed with low energy.  (Id.)

On December 14, 2006, Plaintiff told Dr. Scott he had gotten over his anger at him for not seeing him as disabled.  (Tr. 557).  Dr. Scott said Plaintiff met the criteria for intermittent explosive disorder.[9]  (Id.)  Plaintiff's father asked Dr. Blumenreich to transfer Plaintiff to a new therapist, but Plaintiff told Dr. Scott he wanted to remain with him.  (Id.) On January 4, 2007, Plaintiff reported experiencing passive suicidal ideation.  (Tr. 550). He was sleeping poorly and isolating himself.  (Tr. 551).  Plaintiff scored in the severe range on a depression inventory.  (Id.)

On January 19, 2007, Dr. Blumenreich started Plaintiff on Seroquel to help with his insomnia.  (Tr. 548-49).  Otherwise, Plaintiff's mood was steady, but his mind "would

---

[9] Intermittent explosive disorder is characterized by discrete episodes of failure to resist aggressive impulses resulting in serious assaults or destruction of property.  *DSM-IV-tr* 663.

not stop thinking." (Tr. 548). The next month, his sleep was still impaired, and Dr. Blumenreich increased his Seroquel. (Tr. 545-46). She also completed a Medical Opinion form for Plaintiff on February 16, 2007, opining that he could not work in the foreseeable future due to bipolar disorder. (Tr. 547). The next week, Plaintiff's mood was dysphoric, and he told Dr. Scott he had passive and fleeting suicidal ideation after breaking up with his girlfriend. (Tr. 543). However, Plaintiff was adjusting to his current lifestyle and was less depressed than before. (Tr. 544.)

On March 27, 2007, Plaintiff told Dr. Blumenreich he was "up and down," and irritable with low motivation and trouble following through. (Tr. 541). Dr. Blumenreich suspected some of Plaintiff's symptoms were due to residual ADHD. (Tr. 542). She started Plaintiff on Wellbutrin, but had him discontinue in April because it made him feel "high." (Tr. 539). At that time, Plaintiff slept twelve hours and had trouble waking up. (Id.) On April 26, 2007, Plaintiff told Dr. Scott that Seroquel was helping him sleep, but he would get anxious and restless, prompting him to walk eight miles a day. (Tr. 538). He also went fishing with a friend and tried to stay busy. (Id.)

When Plaintiff saw Dr. Blumenreich on June 5, 2007, he was manic with impaired sleep and high energy. (Tr. 534). He felt drugged on Seroquel and lithium. (Id.) His speech was unusually pressured, and he reported racing thoughts. (Tr. 535). Dr. Blumenreich discontinued Seroquel and started Abilify. (Tr. 535). She also completed a Medical Opinion form for Plaintiff that day. (Tr. 536). She opined that Plaintiff would not be able to perform any employment in the foreseeable future due to bipolar disorder and mood instability. (Id.)

Several weeks later, Dr. Scott noted Plaintiff was distractible.  (Tr. 532).  Plaintiff was not sleeping well on Abilify, and Dr. Blumenreich told him to discontinue and try Lunesta.  (Tr. 533).  However, Plaintiff's mood was good, and he was socializing more with friends.  (Tr. 532-33).  He was looking into going to barber school.  (Tr. 533).  The next week, Plaintiff had trouble focusing and was disorganized, restless and fidgety.  (Tr. 530).  Dr. Blumenreich prescribed Adderall.  (Tr. 531).  Plaintiff later told Dr. Blumenreich and Dr. Scott that his attention and concentration were better on Adderall.  (Tr. 527, 529).  On July 31, 2007, Plaintiff was socializing with friends.  (Tr. 527).  At that time, he was on probation in Hennepin County for an old car theft charge.  (Id.)

At the end of August 2007, Plaintiff was walking eight to ten miles a day out of boredom.  (Tr. 525).  His mood was good, but his sleep was variable.  (Id.)  When Dr. Blumenreich saw Plaintiff a month later, he was overall stable but with fluctuating concentration and dysphoric mood.  (Tr. 522-23).  On October 2, 2007, Plaintiff was exploring vocational choices.  (Tr. 520-21).  The next month, Plaintiff was agitated and anxious.  (Tr. 518).  He did not want to wait for disability benefits any longer and wanted to get a job.  (Tr. 519)  He was interested in becoming a barge captain.  (Id.)  His disability hearing was coming up.  (Id.)  When Plaintiff saw Dr. Blumenreich for medication management on November 16, 2007, he felt Adderall was helping his motivation.  (Tr. 516-17).

Plaintiff displayed symptoms of labile affect, anxiety, distraction and agitation on December 7, 2007.  (Tr. 514).  His speech was pressured and rapid.  (Tr. 515).  Plaintiff could not tolerate being bored, so he was helping several friends with projects.  (Id.)

One month later, Plaintiff told Dr. Scott he was spending most of his time ice fishing. (Tr. 513).  He had more energy and motivation when spending time outdoors.  (Id.)

Plaintiff was euphoric and manic when he saw Dr. Scott on March 10, 2008.  (Tr. 506).  He was sleeping less and very actively.  (Tr. 507).  He got up early, walked two or three miles, fished, cleared land for his parents, and helped friends with chores.  (Id.)  He had also done some impulsive spending.  (Id.)  His speech was rapid but not pressured.  (Id.)  One month later, Plaintiff's affect was labile, he was agitated and distractible.  (Tr. 644).  Plaintiff admitted to Dr. Scott that he stopped taking Adderall and Klonopin thirty days ago because he thought he was building a tolerance to Klonopin, and he did not think he could sleep if he took Adderall without Klonopin.  (Tr. 645).  Plaintiff slept poorly and was increasingly irritable.  (Tr. 645).

On May 16, 2008, Plaintiff told Dr. Blumenreich he had "anxiety through the roof." (Tr. 642).  Several days later, Plaintiff told Dr. Scott he could not attend a party at his parent's house because the large crowd made him anxious.  (Tr. 640).  Plaintiff was euphoric, anxious and agitated.  (Id.)

At the request of the SSA, on June 17, 2008, Plaintiff underwent a disability consultative psychological evaluation with Dr. Carole Selin.  (Tr. 484-89).  During the interview, Plaintiff was fidgety and restless.  (Tr. 484).  Plaintiff said he could not sit more than forty minutes.  (Id.)  He was applying for disability due to bipolar disorder and depression.  (Id.)  Plaintiff described being bipolar and anxious around large groups of people, and he was agitated by stupid questions.  (Tr. 484-85).  Plaintiff felt stressed because he could only see his 8-year-old daughter when his parents had monthly visitation.  (Tr. 485).  Plaintiff listed his current symptoms as appetite change, tension,

insomnia, digestive upset, accident-prone, teeth-grinding, restlessness, foot tapping, forgetfulness, poor concentration, low productivity, negative attitude, spacing out, intolerance, fewer contacts with friends, lack of intimacy, anxiety, frustration, mood swings, bad temper, irritability and depression.  (Tr. 486).  His present medications were Adderall, lithium and Klonopin.  (Id.)  Adderall was helping quite a bit with his short-term memory.  (Id.)

Plaintiff's current interests were dice games, camping, fishing and hiking.  (Tr. 487).  He saw his friends daily.  (Id.)  In the winter, he fished with his friends for 12-14 hours daily.  (Id.)  He rode a bike or walked to a store three times a week.  (Id.)  He sometimes had moods where he wanted to be alone for a month.  (Id.)  Other times, he got up at 6:00 a.m., ready to do something.  (Id.)  During the day, he read magazines, watched television, listened to music, fished or gardened.  (Id.)  He often had lunch with his brother.  (Id.)  Plaintiff groomed daily and ate one to three meals.  (Id.)  He cooked, did laundry, washed dishes, bought groceries and compulsively cleaned.  (Id.)  His daily activities varied.  (Id.)  He did not sleep well at night because his mind raced.  (Id.)  Plaintiff no longer wanted to work in the auto business and wanted to go back to school.  (Id.)

On mental status examination, Plaintiff was oriented with appropriate stream of consciousness, adequate and organized thought content, appropriate affect and normal mood, borderline impaired concentration but without credible effort, adequate pace and adequate memory.  (Tr. 488).  Dr. Selin noted she did not assess for personality disorder.  (Id.)  She diagnosed mood disorder, NOS; recent diagnosis of ADHD; polysubstance dependence in alleged remission; and a current GAF score of 60.  (Id.)

Dr. Selin opined that assessment of ADHD was not adequately documented and diagnosis required a third-party report or school records.  (Id.)  She noted that Plaintiff's records from 2005 and 2006 indicated continued use of alcohol and cannabis, which can cause depression, panic and anxiety.  (Id.)  She recommended substance abuse evaluation.  (Id.)

Dr. Selin also recommended personality disorder evaluation.  (Tr. 489).  She diagnosed mood disorder, NOS.  (Id.)  She also could not rule out malingering due to Plaintiff's lack of effort on certain tasks, but he had no problem sitting in the interview for 1 ½ hours, and his pace and memory were adequate.  (Id.)  Dr. Selin opined Plaintiff had no problems with understanding, remembering and following directions, and his history suggested a pattern of avoiding certain people and jobs.  (Id.)  He showed variable persistence but quick pace.  (Id.)  Dr. Selin opined Plaintiff may be able to tolerate stress at a job, and he could do activities for hours.  (Id.)  She noted Plaintiff said he fished 220 days per year.  (Id.)

Plaintiff's was angry, anxious and agitated about his consultative examination for social security disability benefits when he saw Dr. Scott on July 1, 2008.  (Tr. 638.)  Dr. Scott had to report a threatening statement Plaintiff made, although Plaintiff said he would not act on his thoughts.  (Id.)  Later that month, Plaintiff had a confrontation with local police but was not arrested.  (Tr. 636-37).  He expected a short jail sentence for probation violation.  (Tr. 637).  Plaintiff said he was sleeping poorly again.  (Id.)  He was anxious and agitated.  (Tr. 636).  In August, Plaintiff said he went fishing a lot, and he was not making any significant plans until he got a disability determination.  (Id.)  At the end of the month, Plaintiff was distractible.  (Tr. 634-35).  He had been given a sentence

of community service hours requiring him to paint a house. (Tr. 635). He showed up some days but other days, if he was distracted by watching television, he did not go. (Tr. 635).

On September 25, 2008, Plaintiff was irritable, reactive and manic. (Tr. 632). He walked eighteen miles the previous day and slept poorly. (Tr. 633). He spent most of his time fishing and visiting friends. (Id.) Dr. Scott noted Plaintiff's unemployment was due to past felonies secondary to antisocial behavior. (Tr. 632). On November 6, 2008, Plaintiff was agitated, and his affect was labile. (Tr. 630). He was impatient with others when manic, and his anger alienated him from others. (Tr. 630-31). Dr. Scott diagnosed antisocial traits and bipolar disorder. (Tr. 631). Approximately two weeks later, Plaintiff was manic with high energy. (Tr. 628). He reported a two week period where he walked up to seventeen miles a day, had little sleep, and was more irritable. (Tr. 629).

On December 16, 2008, Plaintiff continued to be agitated, distractible and hypomanic. (Tr. 626). His manic episode had ended a few days earlier. (Tr. 627). Plaintiff's mood stabilized in early January 2009. (Tr. 624-25). However, at the end of the month, Plaintiff was euphoric, hyperactive, and also frustrated with waiting for a decision on disability benefits. (Tr. 622-23). Dr. Scott opined that Plaintiff was disabled secondary to bipolar disorder. (Tr. 622). On March 2, 2009, Plaintiff was agitated and anxious. (Tr. 620). The following week, Plaintiff told Dr. Blumenreich he had been feeling irritable and impatient for three weeks, with racing thoughts and poor sleep. (Tr. 617). On examination, there was no evidence of manic symptoms. (Tr. 618). Dr. Blumenreich's assessment was mild depressive symptoms. (Id.)

On March 17, 2009, Dr. Blumenreich wrote a "To Whom It May Concern" letter regarding Plaintiff, noting she had been treating him since August 2006. (Tr. 619). His diagnoses included bipolar disorder, attention-deficit/hyperactivity disorder, and chemical dependency in remission. (Id.) His current medications were lithium, Adderall and Klonopin. (Id.) He had been compliant with his medications, but his moods and racing thoughts fluctuated. (Id.) Dr. Blumenreich opined "[h]e has not been able to be gainfully employed due to this." (Id.)

On April 21, 2009, Plaintiff's sleep and concentration were impaired, he was anxious, but his mood appeared euthymic. (Tr. 613-14). On May 19, 2009, Plaintiff's affect was labile, and he reported increased irritability, particularly with his parents. (Tr. 611-12). The next month, Plaintiff exhibited no evidence of mania, but his energy level was high and mood was good. (Tr. 609-10). Plaintiff continued to complain of impaired sleep and described a sleep walking incident. (Tr. 609-10). Dr. Blumenreich recommended a sleep study. (Tr. 610). On June 30, 2009, Dr. Scott noted Plaintiff was not sleeping well, but Plaintiff said it did not matter because he did very little during the day. (Tr. 605).

On August 20, 2009, Plaintiff was irritated and agitated. (Tr. 601). After he switched from Klonopin to Valium, Plaintiff said he was only getting two to four hours of interrupted sleep. (Tr. 602). In October 2009, Dr. Blumenreich noted Plaintiff was stable with the exception of his poor sleep. (Tr. 600). Plaintiff was spending his time helping a friend remodel his house. (Tr. 599). Several weeks later, Plaintiff told Dr. Scott he was isolated, bored and anxious. (Tr. 597-98). He had been sleep walking

again.  (Tr. 598).  Plaintiff said he needed to take 20 mg of Valium to be able to sleep. (Id.)

On November 24, 2009, Plaintiff told Dr. Scott he was sleeping only one or two hours at night and was distractible and forgetful.  (Tr. 596).  Plaintiff was looking forward to getting disability benefits and planned to go to school to study wildlife management. (Id.)  When Plaintiff saw Dr. Blumenreich the next week, she saw no evidence of mania, depression or psychosis, but Plaintiff was dysphoric.  (Tr. 593-94).

Dr. Blumenreich completed a questionnaire on January 5, 2010, regarding Plaintiff's mental residual functional capacity.  (Tr. 676-79).  First, she noted Plaintiff's diagnoses were bipolar disorder, ADHD, and chemical dependency in remission; and his symptoms were mood instability, primarily irritability and impulsivity.   (Tr. 676). Considering only the symptoms from his mental impairments, she opined Plaintiff could not perform simple, unskilled and low stress work eight hours per day, five days a week on a sustained basis (longer than three months).  (Id.)  Dr. Blumenreich then circled the response she found best described Plaintiff's ability to do certain mental work tasks. (Tr. 677-78).   She circled "moderately limited" for 14 out of 20 tasks, and "not significantly limited" for the remaining six tasks:  the ability to understand and remember very short and simple instructions; the ability to carry out very short and simple instructions; the ability to sustain an ordinary routine without special supervision; the ability to make simple work-related decisions; the ability to ask simple questions or request assistance; and the ability to be aware of normal hazards and take appropriate precautions.  (Id.)  Dr. Blumenreich did not check "markedly limited" for any task.  (Id.)

Her opinion of Plaintiff's inability to work would not change if he stopped all use of drugs and alcohol.  (Tr. 679).

Plaintiff's counsel wrote to Dr. Blumenreich several weeks later, relating that the Administrative Law Judge in Plaintiff's disability case found Dr. Blumenreich's disability opinion inconsistent with her ratings of "moderately limited" in the following tasks:  ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; ability to make simple work-related decisions; and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 682-83, 677-78).  Counsel asked Dr. Blumenreich to clarify whether Plaintiff was able to perform simple, unskilled and low stress work on a sustained basis or whether he was markedly limited in the above categories.  (Tr. 682). Dr. Blumenreich changed her responses to markedly limited in the above categories, and indicated Plaintiff had been incapable of simple, unskilled and low stress work since May 3, 2004.  (Tr. 684-87).

Dr. Karen Butler was sent Medical Interrogatories as an impartial medical expert for Plaintiff's social security disability claim, and she responded on April 14, 2010.  (Tr. 689-94).  Dr. Butler reviewed the evidence that was provided to her but never examined Plaintiff.  (Tr. 689).  Dr. Butler opined the evidence established that Plaintiff had medically determinable impairments of ADHD/ADD, bipolar disorder, and polysubstance abuse in remission.  (Tr. 689).  She opined that these impairments resulted in mild

restriction in Plaintiff's daily activities, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.  (Tr. 690).

In support of these conclusions, Dr. Butler cited evidence that Plaintiff went from being homeless to living independently in an apartment, where he cooked, cleaned, did laundry, shopped, used public transportation, paid bills, used money orders and was independent in self-care.  (Id.)  Socially, she noted Plaintiff had some problems with people in authority, but he talked to his mother on the phone daily and had friends with whom he "hung out," hiked, fished and grilled.  (Id.)  He had one friend he saw daily, and others he texted daily.  (Id.)  Regarding Plaintiff's concentration, Dr. Butler noted the following evidence:  Plaintiff could focus when he wanted to and when things were interesting to him; he helped friends with yard work and moving things; and his memory and concentration were unimpaired.  (Tr. 690-91.)  Because Plaintiff was not markedly impaired in any of the areas of function, Dr. Butler opined he did not meet or equal a listed impairment under Listings 12.02 or 12.04.  (Tr. 690-92).  Dr. Butler believed that Plaintiff had the ability to perform simple, unskilled to lower semi-skilled work with low to moderate standards for pace and production, with brief, superficial and infrequent contact with others, in an alcohol and drug free environment.  (Tr. 693).

Dr. Butler also completed a "Medical Source Statement of Ability To Do Work-Related Activities (Mental)" form on April 14, 2010.  (Tr. 696-97).  Here, she indicated Plaintiff would be markedly limited in understanding, remembering and carrying out complex instructions and making judgments on complex work-related decisions.  (Tr. 695).  Plaintiff would be mildly limited in understanding, remembering and carrying out

simple instructions, and moderately limited in making judgments on simple work-related decisions. (Id.)  He would also be moderately limited in interacting appropriately with the public, supervisors, coworkers and in responding to changes in a routine work setting.  (Tr. 696).  Dr. Butler based her opinion on the fact that Plaintiff visited friends daily but had periods of irritability and difficulty getting along with authority figures.  (Id.) He had low average to borderline recall but was able to perform a full range of daily activities independently.  (Tr. 695).

### B.    New Records Submitted to the Appeals Council

Plaintiff saw Dr. Blumenreich for an updated diagnostic assessment on September 24, 2010.  (Tr. 699-702).  His last visit was in July 2010, and since then he had more manic symptoms, despite compliance with treatment.  (Tr. 699-700).  His symptoms were increased energy, racing thoughts, irritable and argumentative, hypersexual, less sleep and appetite, and unable to complete tasks.  (Id.)  Dr. Blumenreich stated that Plaintiff continued to see Dr. Scott for therapy, and in Dr. Scott's treatment notes and her discussions with Dr. Scott, they had gotten to know Plaintiff better and his symptomatology was more apparent, as was his inability to function as would be expected of a healthy person his age.  (Tr. 700).  She expected Plaintiff's low functioning and serious mental illness to be chronic and require medication for the rest of his life.  (Id.)  Dr. Blumenreich noted she and Dr. Scott had noticed over the years that Plaintiff was unable to perform any activities within a schedule, maintain regular attendance or be punctual.  (Id.)  Furthermore, he could not sustain an ordinary routine without supervision or work in coordination or proximity to

others due to his manic symptoms and distractibility.  (Id.)  He was also unable to make simple work-related decisions.  (Id.)

Dr. Blumenreich noted Plaintiff had been completely sober for over four years. (Tr. 701).   On mental status examination, Plaintiff was mildly hypomanic but paid attention, although he was somewhat fidgety.  (Id.)  He was oriented and his memory appeared unimpaired.  (Id.)  His judgment and impulsivity were poor when he was more symptomatic.   (Id.)   Plaintiff's diagnoses were unchanged, and Dr. Blumenreich assessed a GAF score of 45-50.  (Tr. 702).  She stated the following:  "I think Mr. Hendricks is impaired and is unable to be gainfully employed.  He is not able to complete simple tasks, and tasks that require machinery or equipment use may be dangerous for him, both due to his bipolar disorder, ADHD symptoms, and the medications he is on."  (Id.)  His medications were lithium and diazepam.  (Tr. 699).

### C.  Administrative Hearing

On January 20, 2010, Plaintiff testified as follows at a hearing before an administrative law judge. (Tr. 25-36).  Plaintiff lived alone in an apartment.  (Tr. 25).  He was divorced and had a 10-year-old daughter.  (Tr. 26).  Plaintiff had trouble focusing in high school but he graduated.  (Tr. 27).  He went to vocational school.  (Tr. 26).  Plaintiff last worked six years ago.  (Tr. 27).  He left his last job because he got anxious and could not stay there anymore.  (Id.)  He then stayed at a friend's house in exchange for doing maintenance.  (Tr. 28).  Plaintiff was unable to finish tasks like mowing the lawn and other projects.  (Id.)    He was on medications, but he still had trouble staying on task and getting things done.   (Id.)   He did not complete things when anxious or frustrated. (Tr. 29).  Plaintiff last drank alcohol about four and half years ago.  (Id.)  He

no longer went to AA or NA meetings.  (Id.)  Plaintiff did not believe he could work full-time at any job for any length of time because he is irritable with people and little things set him off.  (Tr. 33-34).

The ALJ was concerned about what he saw as a discrepancy in Dr. Blumenreich's opinion and the questionnaire she completed, which Plaintiff relied on in his opening statement.  (Tr. 23, 30-32, 39-40).  The ALJ left the record open for Plaintiff to get clarification from Dr. Blumenreich.  (Tr. 39-40).

A doctor of internal medicine testified at the hearing, but he did not find any physical matters that interfered with Plaintiff's ability to work.  (Tr. 35).  Then, Kenneth Ogren testified as a vocational expert.  (Tr. 35, 351-52).  Ogren testified that Plaintiff's past relevant work included dishwasher, lawn care, waiter, and service manager.  (Tr. 35-36).  Plaintiff's job as a service manager involved impounding vehicles for the City of Minneapolis and estimating service work on cars.  (Tr. 36).  His vocational training as an auto mechanic was done his junior and senior years of high school at Hennepin Tech.  (Id.)

The ALJ asked Ogren if Plaintiff were limited to brief and superficial contact and a minimum quota, minimum stress job, could he return to his past relevant work.  (Tr. 37).  Ogren said he could not be a service manager, but possibly lawn care, later adding what he meant by "possibly":

> I guess what I'm referring to is a 40-hour-a-week person that would be caring for lawns, working at a golf course, something like that, riding, riding the lawnmower and then, with, with that, also the snow removal.

(Tr. 37).  Plaintiff's counsel asked Ogren to assume Plaintiff was markedly limited in performing activities within a schedule and maintaining regular attendance, would that

preclude performance of the jobs Ogren mentioned and all other competitive employment. (Tr. 39).  Ogren agreed that it would.  (Id.)

### D.    The ALJ's Decision

In concluding that Plaintiff was not disabled, the ALJ followed the sequential, five-step process set forth in the Code of Federal Regulations.  See 20 C.F.R. §§ 404.1520, 416.920.  Under the five-step sequential process, a claimant is disabled only if:  1) he or she is not presently engaged in substantial gainful activity; 2) he or she has a severe impairment that significantly limits his or her ability to perform basic work activities; 3) his or her impairment is presumptively disabling; 4) if his or her impairment is not presumptively disabling, the claimant cannot perform his or her past relevant work; and 5) if the claimant cannot perform his or her past relevant work, the burden shifts to the Commissioner to prove that there are other jobs that exist in significant numbers that the claimant can perform.  Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of May 3, 2004. (Tr. 14).  At step two, the ALJ found that Plaintiff had severe impairments of ADHD/ADD, bipolar affective disorder, and polysubstance abuse in remission.  (Id.)  At step three of the disability evaluation, the ALJ considered whether Plaintiff met or equaled a listed impairment and determined that he did not.  (Tr. 15-16).  The ALJ found Plaintiff had only a mild restriction in activities of daily living because he lived independently, cooked, cleaned, did laundry, shopped, used public transportation and paid bills.  (Tr. 15).

The ALJ found Plaintiff to have moderate limitations in social functioning because he talked to his mother on the phone; visited, hiked, fished and grilled with friends; he saw one friend daily and others he texted daily; but he had problems with people in authority.   (Id.)   The ALJ also found Plaintiff to have moderate difficulties in concentration, persistence or pace because he could focus on tasks when he wanted to and when things were interesting; he helped friends with yard work and moving; and his memory and concentration were reported to be unimpaired.  (Tr. 15).  Additionally, Plaintiff had no episodes of decompensation, no evidence that a minimal increase in mental demands would cause him to decompensate; and no history of inability to function outside a highly supportive living arrangement.  (Tr. 15-16).

After reviewing the record, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels but limited to simple, unskilled, lower level semi-skilled work, with low to moderate standards for pace and production; only brief, superficial, and infrequent contact with coworkers, supervisors and the public; performed in a drug and alcohol free environment.  (Tr. 16).  In arriving at his RFC determination, the ALJ found that Plaintiff could focus when he wanted to and when things were interesting to him.   (Tr. 17).   His memory and concentration were unimpaired.  (Id.)  Plaintiff could perform a full range of daily activities independently and of his own volition, and was only mildly impaired in understanding, remembering and carrying out simple instructions.  (Id.)  Plaintiff was only moderately impaired in interacting appropriately with coworkers, supervisors, and the public and responding to change in a routine work setting.  (Id.)

The ALJ considered Dr. Blumenreich's opinion and the questionnaire she completed on January 5, 2010.  (Tr. 17).  The ALJ noted Dr. Blumenreich had found Plaintiff only moderately impaired in any mental work-related activity but opined that Plaintiff could not perform simple, unskilled, low stress work eight hours per day, five days per week on a sustained basis.  (Id.)  In response to a letter from counsel, Dr. Blumenreich changed some of her responses to "markedly limited" but did not explain why.  (Tr. 18).  The ALJ found Dr. Blumenreich's initial ratings, only moderate limitations, were consistent with the preponderance of the evidence, including the medical interrogatories submitted by Dr. Butler.  (Id.)

At the fourth step of the disability evaluation, the ALJ relied on the VE's testimony and concluded Plaintiff could perform his past relevant work as a landscape worker.  (Tr. 18).  Thus, the ALJ decided Plaintiff was not under a disability as defined in the Social Security Act.  (Tr. 19).

## IV.    STANDARD OF REVIEW

Disability, as defined by the Social Security Act, is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).[10]  To be eligible for benefits, an individual's impairments must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

---

[10]    Although not applicable here, there is an alternative definition of disability for individuals who have attained age 55 and are blind.  42 U.S.C. § 423(d)(1)(B).

Judicial review of the Commissioner's decision to deny disability benefits is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole.  Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005).  Substantial evidence exists if "a reasonable mind would find such evidence adequate."  Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (quoting Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000).  The substantial evidence test requires "more than a mere search of the record for evidence supporting the [Commissioner's] findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (alterations in original) (quoting Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987)).  Rather, the court "must take into account whatever in the record fairly detracts from its weight."  Id.  (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

## V.    DISCUSSION

Plaintiff raises three issues in support of his motion for summary judgment.  First, he contends the ALJ's reliance on records where he was "doing well" is misplaced because the ALJ failed to consider all of the medical evidence and the nature of his condition.  Second, Plaintiff argues the ALJ failed to give appropriate weight to the treating psychiatrist's opinions or alternatively failed to re-contact the treating psychiatrist.  Third, Plaintiff contends the ALJ failed to include ADHD and bipolar disorder, and limitations resulting from those impairments, in the hypothetical question to the vocational expert.  The first two issues fall under the ALJ's RFC determination, and the third issue relates to the ALJ's finding that Plaintiff could perform his past relevant work.

A.   **Whether the ALJ Erred in his Residual Functional Capacity Determination.**

1.   **Whether the ALJ failed to consider all relevant evidence.**

Plaintiff's first argument is that the ALJ failed to consider all of the relevant evidence in the record.  See Lauer v. Apfel, 245 F.3d 700, 703-04 (8th Cir. 2001) ("the ALJ 'bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence" (quoting Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000); 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").  Plaintiff contends that the ALJ commented only on instances when Plaintiff had the ability to focus and was found to have unimpaired memory and concentration and ignored instances where Plaintiff had symptoms of anxiety, mania, racing thoughts, irritability, insomnia, and issues with memory and concentration.   Upon review of the record, the Court finds Plaintiff is correct.

The ALJ's discussion of the record is so brief that the Court cannot determine whether the ALJ considered and weighed all of the evidence.  See Willcockson, 540 F.3d at 879-80 (remanding where court could not determine from written decision whether the ALJ properly reviewed the evidence).   In addressing Plaintiff's allegation that he has trouble focusing and finishing tasks, the ALJ cited one session between Plaintiff and Dr. Wamuo where Plaintiff said that he could focus when he wanted to and when things were interesting to him.  (Tr. 17.)   The ALJ did not mention contrary evidence.  (See Tr. 424 Plaintiff reported he had difficulty following through with things since elementary school; (Tr. 425) significant feelings of restlessness and fidgetiness; (Tr. 413, 416, 433) lifelong inattentiveness; (Tr. 414, 442) distracted and bored easily,

trouble finishing tasks, distractible and impulsive; (Tr. 541) little motivation and trouble following through; (Tr. 542) Dr. Blumenreich suspected some of Plaintiff's symptoms were due to residual ADHD; (Tr. 530) sleep and concentration were impaired; disorganized with trouble focusing, restless and fidgety; (Tr. 522-23) overall stable but with fluctuating concentration and dysphoric mood; (Tr. 514, 644, 626) distractible; (Tr. 515) could not tolerate being bored; (Tr. 484) fidgety and restless; (Tr. 596) distractible and forgetful).

The ALJ also referred to two exhibits, 19F and 21F, stating "it was reported that the claimant's memory and concentration are unimpaired."[11]   Within these exhibits, Dr. Blumenreich appears to have used different forms to record her clinical notes, and the memory/concentration category that the ALJ referred to was not included on all of the forms.   (Tr. 534, 539, 541; compare Tr. 593, 599, 603).   While there are records in Exhibits 19F and 21F where Dr. Blumenreich checked the box "unimpaired" under the category of memory/concentration (Tr. 510, 516); there are also records where Dr. Blumenreich checked the box "impaired" (Tr. 522, 613).   Additionally, the ALJ did not mention records from Dr. Scott where he noted that Plaintiff was distractible (see paragraph above) or manic.  (Tr. 506, 534, 628, 632).  The ALJ appears to have ignored a great deal of evidence.

Although Plaintiff does not specifically challenge the ALJ's credibility analysis, credibility is part of the RFC analysis, and the ALJ never discussed Plaintiff's work

---

[11]   Exhibit 19F consists of "Medical Evidence of Record, dated 09/08/2006 to 03/10/2008, from Carver Cty Mental Health Program." (Court Transcript Index ("Index"), Doc. No. 6-1 at 4; Tr. 506-559) and   Exhibit 21F consists of "Medical Evidence of Record, dated 04/10/2008 to 12/01/2009, from Carver County Mental Health Program." (Index at 4; Tr. 593-645).

history in terms of his ability to hold a job for a length of time, a significant issue presented in Plaintiff's testimony and the record.  (Tr. 33-34).  See Polaski v. Heckler, 739 F.3d 1320, 1322 (8th Cir. 1984) (ALJ must consider all of the evidence presented related to subjective complaints including prior work record, observations by third-parties and physicians; daily activities; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions).  Early treatment records and other evidence indicate Plaintiff quit his last job as a service manager, and then was repeatedly turned down for other jobs because he had a criminal record with a drug charge.  (Tr. 424-27, 442-43, 452, 553).  There is conflicting evidence on why Plaintiff quit his last job.  (Tr. 27, 389, 424, 433, 442-43).  In the first Disability Report he submitted to the SSA, Plaintiff said he "abruptly left" his last job "because [he] was too stressed out."  (Tr. 172).  Plaintiff turned down a job offer after the alleged onset date because he did not have transportation.  (Tr. 402).  Plaintiff's parents strongly encouraged him to pursue social security disability, but Plaintiff wanted to find another job.  (Tr. 397, 389-90, 518, 559).

The record presents the question whether Plaintiff simply could not get another job due to his criminal record or, as his parents believed, his inability to hold a job was the result of his ADHD or manic episodes of bipolar disorder.  (Tr. 195-202, 254-61, 424-27, 433-37; compare Tr. 622 (disabled by bipolar disorder) with Tr. 632 (unemployment due to past felonies secondary to antisocial behavior)).  The record may not provide a clear answer to this question, but the ALJ did not attempt to answer it or even acknowledge the conflicting evidence.

Although it is not binding precedent here, the Court notes the Ninth Circuit has held "[w]e review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007) (citing Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir.2003)). The ALJ did not discuss the evidence concerning Plaintiff's work history. The fact that Plaintiff lived independently and did things with his friends, evidence cited by the ALJ, does not address the issue of whether Plaintiff had the ability to sustain work for any length of time, given his ADHD and manic episodes. See Reed v. Barnhart, (ALJ must "guard against giving undue weight to a claimant's ability to carry out the activities incident to day-to-day living").

Remand is necessary because it is unclear whether the ALJ considered all of the medical evidence and credibility factors. Dr. Selin, the consultative psychological examiner, suggested Plaintiff be tested for personality disorder and substance abuse disorder. (Tr. 488-89). Based on the records she reviewed and her interview with Plaintiff, Dr. Selin opined that Plaintiff "may be able" to tolerate stress at a job. (Tr. 489). Other records suggest Plaintiff may have a personality disorder that should be considered in combination with his other impairments. Dr. Scott diagnosed intermittent explosive disorder on one occasion and traits of certain personality disorders on other occasions. (Tr. 557, 444, 631). Dr. Selin was also concerned about the lack of school records or third-party report supporting Plaintiff's diagnosis of ADHD. (Tr. 488). Given the ALJ's very limited analysis in the decision at issue here, on remand, the ALJ may find it helpful in analyzing this case to order additional evaluations and/or records.

**2.      Whether the ALJ should have granted controlling weight to Dr. Blumenreich's RFC opinion**

In making an RFC determination, the ALJ must evaluate every medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c).  The ALJ should give a treating source's RFC opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009).  "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain . . . the weight given to the opinions of a State agency medical or psychological consultant."  20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii); Willcockson, 540 F.3d at 880.

The ALJ declined to grant controlling weight to Dr. Blumenreich's disability opinion because she did not explain why she subsequently changed her ratings on certain of Plaintiff's mental abilities from "moderately limited" to "markedly limited."  (Tr. 18).  Instead, the ALJ found Dr. Blumenreich's ratings of "moderately limited" to be consistent with the medical expert's RFC opinion and the preponderance of the evidence.  The ALJ did not otherwise explain what he considered the preponderance of the evidence to show.  As discussed above, it is unclear from the ALJ's decision whether the ALJ considered all of the relevant medical evidence, because he mentioned only a few treatment records and made no comment on the majority of the evidence.  In this context, the ALJ gave insufficient explanation for granting more weight to the medical expert's opinion over Dr. Blumenreich's opinion.  See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (ALJ must give good reasons for the weight given to the treating physician's opinion).  On remand, in determining Plaintiff's RFC, the ALJ shall

consider all of the relevant medical evidence, including Dr. Blumenreich's follow up assessment of September 24, 2010, which was not earlier available to the ALJ because it was created after the ALJ's decision, and give good reasons for the weight assigned to the various medical opinions.

**B.      Whether the Vocational Expert's Testimony is Substantial Evidence on the Record Supporting the ALJ's Determination that Plaintiff Could Perform His Past Relevant Work.**

An ALJ can rely on a vocational expert's testimony if the testimony was based on a properly phrased hypothetical question. Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996). The Eighth Circuit stated "[i]t has long been the rule in this circuit that a hypothetical question posed to an ALJ must contain all of claimant's impairments that are supported by the record." Pickney v. Chater, 96 F.3d 294, 297 (8th Cir. 1996) (citing example of proper hypothetical: Roe v. Chater, 92 F.3d 672, 674 n.2 (8th Cir. 1996) "history of bipolar affective disorder, low average intelligence, developmental dyslexia, history of conversion reaction . . . able to do more than simple, routine, repetitive work, not relying on written instruction or on written matter, and not requiring constant, close supervision to detail"). A proper hypothetical question to a vocational expert contains all of the concrete consequences of a claimant's impairments. Cox v. Astrue, 495 F.3d 614, 620 (8th Cir. 2007). The hypothetical question does not have to contain specific diagnostic terms if other descriptive terms adequately describe the claimant's impairments. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999) (the following adequately described claimant's mental impairments: he appears to be difficult to understand and to communicate with, so that he has difficulties in his social

life.  He has difficulties in forming friendships.  He prefers to be alone, that in a stressful

situation, that he tends to deteriorate.")

The ALJ did not include any of Plaintiff's impairments that the ALJ found to be

severe, ADHD/ADD, bipolar disorder and polysubstance abuse in remission, either in

specific terms or by describing Plaintiff's symptoms from the impairments in sufficiently

concrete terms.  The ALJ's hypothetical question to the VE was:  "If he were limited to

brief and superficial contact and minimum quota job, minimum stress, could he return to

his past relevant work?"  (Tr. 37).  Furthermore, the hypothetical question did not even

include all of the limitations from the ALJ's RFC determination:  simple, unskilled, lower

level semi-skilled work, with low to moderate standards for pace and production; only

brief, superficial, and infrequent contact with coworkers, supervisors and the public;

performed in a drug and alcohol free environment.  Remand is necessary because the

ALJ relied on an improper hypothetical question posed to the vocational expert.

## VI.    CONCLUSION

Based on the foregoing and all of the files, records and proceedings herein, IT IS

HEREBY RECOMMENDED that:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 10] be GRANTED;

2.    Defendant's Motion for Summary Judgment [Docket No. 15] be DENIED;

3.    The case be remanded for further proceedings consistent with this Report
      and Recommendation, pursuant to Sentence Four of 42 U.S.C. § 405(g).

4.    If this Report and Recommendation is adopted, that Judgment be entered
      accordingly.

Dated:  July 13, 2012                    s/Leo I. Brisbois
                                         LEO I. BRISBOIS
                                         United States Magistrate Judge

35

NOTICE

Pursuant to Local Rule 72.2, any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by July 27, 2012, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection.  A party may respond to the objections within fourteen days of service thereof.  Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.